# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01853-STV

HOLYOKE MUTUAL INSURANCE COMPANY IN SALEM, d/b/a MIDDLEOAK,

     Plaintiff,

v.

CINCINNATI INDEMNITY COMPANY,

     Defendant.

_____

## ORDER
_____

Magistrate Judge Scott T. Varholak

This matter comes before the Court on the parties' cross-motions for summary judgment—*i.e.*, the Motion for Summary Judgment filed by Defendant Cincinnati Indemnity Company ("CIC") [#34] and the Motion for Summary Judgment filed by Plaintiff Holyoke Mutual Insurance Company in Salem, doing business as MiddleOak ("MiddleOak") [#35]. The parties have consented to proceed before the undersigned United States Magistrate Judge for all proceedings, including entry of a final judgment. [#24, 25] This Court has carefully considered the motions and related briefing, the case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the motions.[1] For the following reasons, CIC's

---

[1] On April 11, 2019, CIC filed a Request for Oral Argument on the motions for summary judgment to address issues raised in MiddleOak's sur-reply to CIC's Motion for Summary Judgment and "to respond to any questions the Court may have." [#42] Because the Court does not believe that oral argument would materially assist the Court in its disposition of the motions, CIC's Request for Oral Argument is **DENIED**.

Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART** and MiddleOak's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**.

## I.    BACKGROUND

### A.    UNDISPUTED FACTS[2]

MiddleOak issued an insurance policy to Two Thousand Cheesman East Condominium ("Cheesman") covering the period February 1, 2015 through February 1, 2016 (the "MiddleOak Policy"). [#38-1, MSOF2; #35-2 at 1-131] CIC issued an insurance policy to American Spectrum Real Estate Services Co, Inc. ("Spectrum") covering the period October 15, 2014 through October 15, 2017 (the "CIC Policy"). [#38-1, MSOF3; #35-3] Cheesman entered a Management Agreement with Spectrum, pursuant to which Spectrum was a property manager for Cheesman. [#38-1, MSOF6; #35-6] Spectrum was an Additional Insured ("AI") by definition of the MiddleOak Policy. [#39-1, CSOF17] The CIC Policy provided limited Automatic AI coverage to Cheesman that was limited to coverage for liability incurred by Cheesman caused by Spectrum's acts or omissions; the AI coverage did not extend to liability arising out of Cheesman's independent acts or omissions. [#38-1, MSOF13]

Cheesman entered into a Service Agreement Proposal with Meridian Fire and Security, LLC ("Meridian") for inspection and testing of Cheesman's fire alarm and

---

[2] The undisputed facts are drawn from the Separate Statement of Facts filed with the briefing on Defendant's Motion for Summary Judgment (the "CIC Statement of Facts") [#39-1] and the Separate Statement of Facts filed with the briefing on Plaintiff's Motion for Summary Judgment (the "MiddleOak Statement of Facts") [#38-1]. The Court refers to the sequentially numbered facts set forth in the CIC Statement of Facts as "CSOF#" and refers to the sequentially numbered facts set forth in the MiddleOak Statement of Facts as "MSOF#."

sprinkler system.[3] [#38-1, MSOF14; #36-4] According to the Complaint, on or about May 15, 2015, Meridian was performing a yearly inspection of the fire suppression system on Cheesman's property when a pipe was damaged and released water into an adjacent property causing significant damage.[4] [#1 at ¶¶ 15-17] On April 28, 2016, MiddleOak received notice that The Parkville Condominium Association, Inc. ("Parkville"), the owners of the adjacent property, had made a claim against Cheesman. [#39-1, CSOF2] MiddleOak then consulted with counsel concerning the claim. [*Id.* at CSOF3]

On January 5, 2017, Parkville filed a lawsuit against Cheesman and Meridian in Denver County District Court (the "Parkville Lawsuit"). [#38-1, MSOF4; #35-4] On January 9, 2017, MiddleOak received notice of the Parkville Lawsuit and assigned counsel to defend Cheesman. [#39-1, CSOF4] On May 1, 2017, Cheesman designated Spectrum as a non-party at fault in the Parkville Lawsuit. [*Id.* at CSOF5] On May 15, 2017, Parkville filed a motion to amend its complaint to name Spectrum as a defendant, and on June 20, 2017, Spectrum was added as a named defendant in the Parkville Lawsuit. [*Id.* at CSOF6; #38-1, MSOF5] MiddleOak acknowledged that it insured Spectrum with regard to the claims asserted against Spectrum in the Parkville Lawsuit under the MiddleOak Policy. [#39-1, CSOF8] MiddleOak determined that counsel retained to represent Cheesman could not also represent Spectrum, because he had

---

[3] Although the parties agree that Cheesman executed the contract with Meridian, the parties appear to dispute whether Cheesman or Spectrum was responsible for hiring and supervising the work performed by Meridian at Cheesman's property. [#38-1, MSOF14-15]

[4] Neither the CIC Statement of Facts nor the MiddleOak Statement of Facts directly addresses how the underlying property damage arose. However, the parties do not appear to dispute that the damage resulted from a pipe that was damaged during Meridian's testing of the fire suppression system.

designated Spectrum as a non-party at fault. [*Id.* at CSOF26] On or about July 26, 2017, MiddleOak assigned a second adjuster and separate defense counsel to handle Parkville's claim against Spectrum. [*Id.* at CSOF9] A note in MiddleOak's claim diary for the Spectrum claim dated July 27, 2017 indicates that Spectrum's property management agreement with Cheesman stated that Spectrum would "name [Cheesman] as an additional insured" but "review of the [CIC Policy] does not show that [Cheesman] is an AI." [#34-4 at 2 (capitalization removed); *see also* #39-1, CSOF28]

On or around July 28, 2017, CIC received notice of Parkville's claim against Spectrum from Spectrum's insurance agent and MiddleOak. [#39-1, CSOF10] No later than August 4, 2017, MiddleOak informed CIC that it had retained counsel to defend Spectrum and requested that CIC share in the defense costs. [#38-1, MSOF7; #39-1, CSOF33] CIC advised MiddleOak that the coverage under the CIC Policy was excess coverage and refused to share in Spectrum's defense of the Parkville Lawsuit. [#39-1, CSOF11; #34-4 at 3-4] During the months of August, September, and October of 2017, CIC's adjuster had multiple conversations with MiddleOak's adjuster concerning the claims against Spectrum and the defense of those claims. [#39-1, CSOF34]

On September 22, 2017, Cheesman's counsel in the Parkville Lawsuit suggested to MiddleOak that it might tender Cheesman's defense to CIC. [#39-1, CSOF12] On October 12, 2017, MiddleOak's adjuster for the Cheesman claim was provided permission to tender a claim to CIC on behalf of Cheesman. [*Id.* at CSOF30] On or about November 6, 2017, Cheesman's counsel wrote a letter to Spectrum's counsel in the Parkville lawsuit requesting that CIC share in the defense of Cheesman. [#38-1, MSOF8] Spectrum's counsel received the letter on or about November 7, 2017 and then provided the letter to

CIC on November 13, 2017. [*Id.*] More specifically, the first tender of defense and indemnity by Cheesman to CIC was sent to CIC at 9:46 am on November 13, 2017. [#39-1, CSOF13]

During an "all day mediation" on November 8, 2017, the parties to the Parkville Lawsuit reached a tentative settlement pursuant to which MiddleOak agreed to pay $300,000 to settle Parkville's claims against Cheesman and $25,000 to settle the claims against Spectrum. [*Id.* at CSOF15, CSOF20; #38-1, MSOF10] After settling the Parkville Lawsuit, MiddleOak demanded that CIC reimburse MiddleOak for the settlement payments, attorney's fees, and costs MiddleOak incurred on behalf of Cheesman and Spectrum.[5] [#38-1, MSOF9] CIC declined to reimburse MiddleOak for any portion of these amounts. [#1 at ¶¶ 34, 36, 38, 40; #14 at ¶¶ 34, 36, 38, 40]

## B. Procedural History

On July 20, 2018, MiddleOak filed the instant lawsuit against CIC, asserting the following five causes of action: (1) equitable contribution for MiddleOak's defense and indemnity of Spectrum; (2) equitable contribution for MiddleOak's defense of Cheesman; (3) equitable contribution for MiddleOak's payment of the Cheesman settlement; (4) declaratory judgment regarding CIC's obligations pursuant to the CIC Policy; and (5) unjust enrichment. [#1] On October 4, 2018, CIC filed its answer to the Complaint. [#14] At the Scheduling Conference, the parties proposed—and the Court agreed—"to proceed

---

[5] MiddleOak contends that it paid a total of $62,120.58 in defense of Cheesman and $46,301.48 in defense of Spectrum. [#38-1, MSOF11] CIC responds that MiddleOak has refused to provide discovery in this case sufficient for CIC to confirm these amounts or to determine whether the settlement payments, attorney's fees, costs, and expenses paid by MiddleOak in relation to the Parkville Lawsuit were reasonable and necessary. [*Id.* at MSOF11, MSOF12]

with dispositive motions to determine the legal question of whether [CIC] has an obligation to share in the defense or indemnity costs for Spectrum or Cheesman in advance of conducting further discovery" in the matter. [#27 at 4]

On February 8, 2019, the parties filed cross-motions for summary judgment. [#34, 35] On March 1, 2019, CIC responded to MiddleOak's Motion for Summary Judgment [#36], and MiddleOak responded to CIC's Motion for Summary Judgment [#37]. On March 15, 2019, CIC filed a reply in support of its Motion for Summary Judgment [#39], and MiddleOak filed a reply in support of its Motion for Summary Judgment [#38]. On April 10, 2019, MiddleOak filed a sur-reply in response to CIC's reply. [#41]

## II.  LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). Where, as here, the Court is presented with cross-motions for summary judgment, the Court "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016) (quotation omitted).

When the moving party bears the burden of persuasion at trial, "the moving party must establish, as a matter of law, all essential elements of the [claim on which summary judgment is sought] before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). In other words, the moving party "must support its motion with credible

evidence showing that, if uncontroverted, the moving party would be entitled to a directed verdict." *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL 5728770, at *3 (D. Colo. Sept. 30, 2015) (citing *Celotex Corp.*, 477 U.S. at 331). "The burden then shifts to the non-moving party to produce evidence demonstrating the existence of a genuine factual issue for trial." *Id.*

When the moving party does not bear the burden of persuasion at trial, the movant may satisfy its initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact "simply by pointing out to the court a lack of evidence . . . on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir.1998). If the movant carries this initial burden, the burden then shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial." *Id.* at 671 (quotation omitted).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson*, 477 U.S. at 248-49; *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). Evidence, including testimony, offered in support of or in opposition to a motion for summary judgment must be based on more than mere speculation, conjecture, or surmise. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine"

if the evidence is so contradictory that if the matter went to trial, a reasonable juror could return a verdict for either party. *Anderson*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

## III.   ANALYSIS

MiddleOak's claims are all premised upon its assertion that (1) CIC had a duty under the CIC Policy to indemnify Spectrum in the Parkville Lawsuit and thus now must reimburse MiddleOak for CIC's share of the payment made by MiddleOak to settle Parkville's claims against Spectrum; (2) CIC had a duty under the CIC Policy to defend Spectrum in the Parkville Lawsuit and thus now must reimburse MiddleOak for CIC's share of the payment made by MiddleOak to defend Spectrum; (3) CIC had a duty under the CIC Policy to indemnify Cheesman in the Parkville Lawsuit and thus now must reimburse MiddleOak for CIC's share of the payment made by MiddleOak to settle Parkville's claims against Cheesman; and (4) CIC had a duty under the CIC Policy to defend Cheesman in the Parkville Lawsuit and thus now must reimburse MiddleOak for CIC's share of the payment made by MiddleOak to defend Cheesman. The parties cross-move for summary judgment in their favor on each of these four legal contentions. The Court addresses each in turn.

### A.   CIC Did Not Have a Duty to Indemnify Spectrum

CIC argues that it had no duty to indemnify Spectrum in the Parkville Lawsuit because MiddleOak's coverage for Spectrum was primary to CIC's excess coverage of

Spectrum. [#34 at 5-8] Specifically, CIC points to a specific endorsement to the CIC Policy (the "Real Estate Manager Endorsement"), which states: "With respect to your liability arising out of your management of property for which you are acting as real estate manager this insurance is excess over any other valid and collectible insurance available to you." [#34-9 at 49; #39-1, CSOF21] The Real Estate Manager Endorsement expressly states that it "changes the policy" and "modifies insurance provided" under the commercial general liability coverage part. [*Id.* (capitalization removed)]

Initially, MiddleOak contended that the CIC Policy and the MiddleOak Policy were both primary, because the MiddleOak Policy "contains *exactly the same* [Real Estate Manager Endorsement]" and thus the endorsements "are mutually repugnant and must be considered void" to prevent Spectrum from being left with no coverage. [#37 at 7 (emphasis in original)] In subsequent briefing, however, MiddleOak clarified that it was mistaken when it represented that the MiddleOak Policy contained the Real Estate Manager Endorsement. [#41 at 2] MiddleOak now concedes that the Real Estate Manager Endorsement "is a part of the [CIC Policy], and is not a part of the MiddleOak [P]olicy." [*Id.*] Accordingly, MiddleOak acknowledges that the Real Estate Manager Endorsement in the CIC Policy "explicitly applies" to Spectrum's direct liability arising out of Spectrum's management of property and thus the CIC Policy "is . . . excess for [the] cost to . . . indemnify Spectrum for its direct liability" in the Parkville Lawsuit. [*Id.* at 3]

The Court agrees that the Real Estate Manager Endorsement applies to make the CIC Policy excess to the primary insurance provided to Spectrum by the MiddleOak Policy for its liability in the Parkville lawsuit. Accordingly, MiddleOak is not entitled to contribution from CIC for the payment MiddleOak made to settle Parkville's claims against Spectrum.

See *Colonial Ins. Co. v. Am. Hardware Mut. Ins. Co.*, 969 P.2d 796, 800 (Colo. App. 1998) (applying clause making insurance "excess over any other insurance" and finding that excess insurer was not liable for indemnity of insured). The Court thus **GRANTS** CIC summary judgment on MiddleOak's claims to the extent they seek contribution from CIC for the indemnity provided to Spectrum in the Parkville Lawsuit.

### B. CIC Had a Duty to Defend Spectrum

Despite its acknowledgement that the Real Estate Manager Endorsement applied to relieve CIC of any duty to indemnify Spectrum in the Parkville Lawsuit, MiddleOak contends that CIC did have a duty to defend Spectrum in the Parkville Lawsuit and thus remains liable to MiddleOak for the costs of that defense. [#41 at 3-6] "[I]t is well settled in Colorado that the duty to defend is separate and distinct from the insurer's obligation to indemnify its insured." *D.R. Horton, Inc.—Denver v. Mountain States Mut. Cas. Co.*, 69 F. Supp. 3d 1179, 1195 (D. Colo. 2014).

As the Colorado Supreme Court has explained:

> An insurer's duty to defend arises when the underlying complaint against the insurer alleges any facts that might fall within the coverage of the policy. The actual liability of the insured to the claimant is not the criterion which places upon the insurance company the obligation to defend. Rather, the obligation to defend arises from allegations in the complaint, which if sustained, would impose a liability covered by the policy. [W]here the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim.

*Hecla Mining Co. v. N.H. Ins. Co.* ("*Hecla*"), 811 P.2d 1083, 1089 (Colo. 1991) (citations and quotations omitted). The duty to defend thus "is broader than" the duty to indemnify and "[a]n insurer seeking to avoid its duty to defend an insured bears a heavy burden." *Id.* Specifically, the insurer must show "there is no factual or legal basis on which the

insurer might eventually be held liable to indemnify the insured." *Id.* at 1090. Where the insurer seeks to rely on a policy exclusion, the insurer must "establish that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy." *Id.*

Consistent with the Colorado Supreme Court's guidance in *Hecla*, Colorado courts follow the "Complaint Rule" pursuant to which "the duty to defend is determined by looking at the allegations of the underlying complaint against the insured" and "courts are not allowed to consider extrinsic facts." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 615 (Colo. 1999). "As a general rule under Colorado law, an insurer's duty to defend an insured is triggered solely on the basis of the allegations made within the four corners of the complaint, read against the insurance policy." *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951, 960 (10th Cir. 2011).

CIC argues that it had no duty to defend Spectrum, because, pursuant to the Real Estate Manager Endorsement, the CIC Policy was excess over the primary insurance provided to Spectrum by the MiddleOak Policy, and the CIC Policy further provided that "[w]hen this insurance is excess, [CIC] will have no duty . . . to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit.'" [#39 at 2 (quoting #34-9 at 39 (emphasis omitted))] As stated above, pursuant to the Real Estate Manager Endorsement, "[w]ith respect to [Spectrum's] liability arising out of [its] management of property for which [it] [was] acting as real estate manager[,] [the CIC Policy] is excess over any other valid and collectible insurance available to [Spectrum]." [#34-9 at 49; #39-1, CSOF21] Thus, in order for these provisions of the CIC Policy to apply to relieve CIC of its obligation to defend Spectrum in the Parkville Lawsuit, (1) Spectrum's liability in the Parkville Lawsuit must have arisen out of its management of

property for which it was acting as real estate manager, (2) Spectrum must have had "other valid and collectible insurance" available to it; and (3) another insurer must have "ha[d] a duty to defend [Spectrum] against [the Parkville Lawsuit]."

None of these predicate facts, however, was available to CIC at the time it declined Spectrum's tender of a defense "solely on the basis of the allegations made within the four corners of the [Parkville Lawsuit] complaint, read against the [CIC Policy]." *United Fire & Cas. Co.*, 633 F.3d at 960. With regard to Spectrum, the complaint in the Parkville Lawsuit alleges only (1) that Spectrum "was the agent of" Cheesman;" (2) that "at the time of the water incident, [Spectrum] was acting within the scope of its authority;" and (3) that "Cheesman is vicariously liable for the acts or omissions of [Spectrum]." [#35-5 at ¶¶ 19, 20, 27, 38, 43] Even if these allegations could be construed as sufficient to establish that Spectrum's potential liability arose out of its management of the Cheesman property for which it was acting as real estate manager, the Parkville Lawsuit complaint is completely silent about both the availability of other valid and collectible insurance to Spectrum and any other insurer's duty to defend Spectrum in the Parkville Lawsuit. [*See generally id.*] Nor does the CIC Policy expressly identify any other valid and collectible insurance available to Spectrum for the Parkville Lawsuit or expressly identify any insurer with a duty to defend Spectrum in the Parkville Lawsuit. [*See generally* #34-9] Pursuant to the Complaint Rule, CIC's refusal to tender a defense to Spectrum for the Parkville Lawsuit thus was improper.

To the extent CIC believed, based upon information outside of the complaint and its own policy (*e.g.*, the coverage provided by the MiddleOak policy, the fact that MiddleOak was providing a defense to Spectrum, and the Management Agreement

between Cheesman and Spectrum) that it did not owe Spectrum a defense, "[t]he appropriate course of action . . . [would have been] to provide a defense to [Spectrum] under a reservation of its rights to seek reimbursement should the facts at trial prove that the incident resulting in liability was not covered by the policy, or to file a declaratory judgment action after the underlying case ha[d] been adjudicated." *Hecla*, 811 P.2d at 1089. Where, as here, the insurer instead denies the insured a defense, the Court must apply the Complaint Rule and its analysis of the duty to defend is limited to consideration only of the complaint read against the insurance policy.[6]

CIC argues that MiddleOak is not entitled to equitable contribution, because "where the excess insurer had no duty to defend, the primary insurer has a complete obligation of defense and no right to contribution" and thus, had CIC "paid any defense costs, it would have a right of recovery of all such amounts from MiddleOak." [#39 at 2] None of the cases cited by CIC for this proposition, however, involve an excess insurer that declined to provide its insured a defense on the basis of the availability of "other

---

[6] As the Supreme Court of Colorado has explained:

> [The Court] determine[s] the duty to defend on the same basis both before and after the completion of the underlying litigation to ensure that insurers that refuse to defend do not gain an advantage over insurers that establish their obligations before the litigation has completed. When resolving an insurer's obligations in an anticipatory declaratory action brought before the conclusion of the underlying dispute, an insurer's duty to defend is determined from the face of the complaint. [*Constitution Assocs. v. N.H. Ins. Co.*, 930 P.2d 556, 563 (Colo. 1996)]; *see also Hartford Ins. Group v. Dist. Court*, 625 P.2d 1013, 1016 (Colo. 1981) (acknowledging that the trial court found a duty to defend based on the complaint before the underlying litigation was completed but postponing a determination of coverage until the completion of the litigation). Therefore, for insurers that refuse to defend, [the Court] similarly base[s] their duty to defend on the face of the complaint.

*Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 828 (Colo. 2004).

insurance" and thus none considers the applicability of the Complaint Rule.[7] Although the Court is unaware of a Colorado Supreme Court decision addressing this issue, at least one Judge in this District has granted an insurer summary judgment on its contribution claim against another insurer that denied its insured a defense on the basis of an "other insurance" clause in violation of the Complaint Rule. *See Am. Builders Ins. Co. v. ProBuilders Specialty Ins. Co.*, No. 16-CV-1832-WJM-CBS, 2017 WL 4856860, at *5-*8 (D. Colo. June 30, 2017).[8] Courts in other jurisdictions have reached similar

---

[7] *See Unigard Mut. Ins. Co. v. Mission Ins. Co.*, 907 P.2d 94, 99 (Colo. App. 1994) (discussing right of excess insurer to recover amounts expended on indemnity and defense costs from primary insurer to extent maximum of primary policy has not been paid); *D.R. Horton, Inc.—Denver v. Travelers Indem. Co. of Am.*, No. 10-CV-02826-WJM-KMT, 2012 WL 5363370, at *8 (D. Colo. Oct. 31, 2012) (finding that excess insurer was entitled to reimbursement from primary insurer for defense costs incurred by excess insurer); *Colonial Ins. Co.*, 969 P.2d at 801 (same); *Finizio v. Am. Hardware Mut. Ins. Co.*, 967 P.2d 188, 192 (Colo. App. 1998) (finding that excess insurer that funded defense may obtain reimbursement from primary carrier under theories of subrogation and contribution).

[8] In *American Builders*, the plaintiff insurer and the defendant insurer issued successive commercial general liability policies to a developer. 2017 WL 4856860, at *1. When the developer was sued for construction defects on multiple residential homes, the developer tendered the claim to its insurers. *Id.* at *2. Upon confirming that the developer was being provided a defense by the plaintiff insurer, the defendant insurer refused to provide a defense contending that its "policies contain excess defense language in their insuring agreements, and [the defendant insurer] therefore ha[s] no obligation to participate and/or contribute towards [a] defense." *Id.* Specifically, the policies issued by the defendant insurer included language to the effect that the defendant insurer had "the right and duty to defend [the developer] against any suit seeking those damages *provided that no other insurance affording a defense against such suit is available to [the developer]*." *Id.* at *1 (emphasis added). The plaintiff insurer defended the developer in the construction defect lawsuit subject to a full reservation of rights and, at the conclusion of the underlying lawsuit, filed an action against the defendant insurer seeking equitable contribution. *Id.* at *2. In considering the parties' cross motions for summary judgment in the contribution action, Judge William J. Martinez of this District found that the defendant insurer "impermissibly relied on extrinsic evidence"—namely, the plaintiff insurers' policies and decision to provide the developer a defense—"thereby violating the complaint rule, when it decided to refuse [the developer] a defense." *Id.* at *7. Judge Martinez thus concluded that, pursuant to the complaint rule, the defendant insurer owed the developer a defense

14

conclusions. *See, e.g.*, *OneBeacon Ins. Co. v. ProBuilders Specialty Ins. Co.*, No. 3:09-CV-36-ECR-RAM, 2009 WL 2407705, at *8 (D. Nev. Aug. 3, 2009) (denying defendant insurer's motion for summary judgment on primary insurer's claim for equitable contribution for defense costs, because "[t]hough the [defendant insurer's] policies are 'excess' to any other insurance that covers such claims, it is impossible to determine from the complaint against [the insured] what other insurance, if any, was available to cover its potential liability in the [underlying] litigation"); *Nautilus Ins. Co. v. Lexington Ins. Co.*, 321 P.3d 634, 646 (Haw. 2014) (holding that "[i]f a primary insurer is tendered a defense, and believes that it is actually an excess insurer or otherwise has no duty to defend by operation of its 'other insurance' clause, then that primary insurer must still defend in the action").

Had CIC followed the procedure set forth in *Hecla* and provided Spectrum a defense subject to a reservation of rights, the Court agrees that CIC likely would have had a right of recovery from MiddleOak for all amounts expended on that defense. *See supra* note 7. Having improperly refused to tender a defense under the Complaint Rule, however, the Court is not permitted to consider the extrinsic facts necessary to support a finding that CIC was an excess insurer and thus had no duty to defend Spectrum.[9]

---

and the plaintiff insurer was entitled to equitable contribution for the costs of defense of the developer in the construction defects lawsuit. *Id.* at *7-*8.

[9] The Tenth Circuit has recognized two exceptions to the Complaint Rule, neither of which has yet been adopted by the Colorado Supreme Court. *See KF 103-CV, LLC v. Am. Family Mut. Ins. Co.*, 630 F. App'x 826, 830 (10th Cir. 2015). In *Pompa v. Am. Family Mut. Ins. Co.*, the Tenth Circuit permitted the consideration of the insured party's prior criminal conviction for negligent homicide to decide if the insurer had a duty to defend a wrongful death action. 520 F.3d 1139, 1145–49 (10th Cir. 2008). In *Apartment Inv. & Mgmt. Co. v. Nutmeg Ins. Co.*, the Tenth Circuit considered a set of related complaints under the Complaint Rule for purposes of determining the duty to defend. 593 F.3d 1188, 1192-96 (10th Cir. 2010). Neither of those exceptions is applicable here, and the Tenth

Although CIC contends that "[i]t makes no sense to suggest that [CIC] should have assumed the duty to defend where it would then have been entitled to recover any expenses from the primary carrier" [#39 at 3], that is exactly the procedure prescribed by *Hecla* for an insurer, like CIC here, whose duty to defend can only be refuted by reference to extrinsic facts. As the *Hecla* Court explained, "[d]etermining the duty to defend based on the allegations contained within the complaint comports with the insured's legitimate expectation of a defense, and prevents the insurer from evading coverage by filing a declaratory judgment action when the complaint against the insured is framed in terms of liability coverage contemplated by the insurance policy." 811 P.2d at 1090. "Requiring the average [insured] . . . to bear the onerous financial burden of proving that they are entitled to a defense from liability claims asserted against them would deny the insured the protection afforded by a liability policy." *Id.* at 1090 n.11. The Colorado Supreme Court has further explained that it is necessary to evaluate an insurer's refusal to defend through the lens of the Complaint Rule to avoid "creat[ing] an incentive for insurers to refuse to defend in the hope that litigation will reveal that no duty to defend exists." *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 828 (Colo. 2004).

Limited by the Complaint Rule, CIC is unable to establish that its coverage for Spectrum in the Parkville Lawsuit was excess over the MiddleOak Policy and thus CIC improperly refused to defend Spectrum in the Parkville Lawsuit. As a result, MiddleOak

_____

Circuit has expressed hesitance to establish any further exceptions to the Complaint Rule. *See, e.g.,* KF 103-CV, LLC, 630 F. App'x at 830 (applying Complaint Rule to refuse to consider state court rulings in related litigation); *Landmark Am. Ins. Co. v. VO Remarketing Corp.*, 619 F. App'x 705, 710 (10th Cir. 2015) (noting that "further expansion of th[e] exceptions [already recognized] was unwarranted"); *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951, 961 (10th Cir. 2011) (refusing to adopt urged exception to Complaint Rule).

is entitled to equitable contribution from CIC for the costs it incurred in its defense of Spectrum in the Parkville Lawsuit. *See Am. Builders Ins. Co.*, 2017 WL 4856860, at *8. Because the amount of defense costs reasonably incurred by MiddleOak in its defense of Spectrum is disputed and the parties have not yet engaged in discovery on this issue [#38-1, MSOF11], the Court limits its ruling to a finding that MiddleOak is entitled to equitable contribution from CIC with the specific amount of that contribution to be determined at a later stage of these proceedings.[10]

### C.     CIC Is Not Liable for Either the Defense or Indemnity of Cheesman

CIC contends that it has no liability for either the defense costs or indemnity paid by MiddleOak on behalf of Cheesman in connection with the Parkville Lawsuit, because the "no-voluntary payment" clause in the CIC Policy "prevents MiddleOak from recovering any payment, obligation or incurred expense, since all payments, obligations and expenses were incurred without [CIC's] consent and prior to any notice to [CIC]."[11] [#34 at 10]   The "no-voluntary payment" clause of the CIC Policy states:   "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [CIC's] consent."   [#34-9 at 37-38; #39-1, CSOF31]  It is undisputed that "[t]he first tender of defense and indemnity by Cheesman

---

[10] In its reply in support of its motion, MiddleOak argues that CIC waived any objection to the reasonableness of the defense costs incurred by MiddleOak by failing to provide the required defense under a reservation of rights.  [#38 at 5]  The Court finds this waiver argument, presented in a reply brief, insufficiently developed for the Court to resolve at this stage of the proceedings.

[11] CIC also argues that the CIC Policy does not provide coverage for Cheesman's defense and indemnification because Cheesman's potential liability in the Parkville Lawsuit was not "caused by" Spectrum's work or the acts and omissions of Spectrum as required for the CIC Policy to provide coverage for Cheesman.  [#34 at 11-12] Because, for the reasons that follow, the Court finds CIC is entitled to summary judgment based on the no-voluntary payments clause, the Court does not address this alternative argument.

was sent to [CIC] at 9:46 am on November 13, 2017." [#39-1, CSOF13] It is undisputed that, at a mediation conducted on November 8, 2017, the parties to the Parkville action, with MiddleOak's approval, agreed to a settlement of the claims against Cheesman for $300,000. [*Id.* at CSOF15]

In response, MiddleOak contends that CIC's duty to defend Cheesman was triggered no later than July 31, 2017 (more than three months prior to the settlement) when MiddleOak notified CIC of the amendment of the complaint in the Parkville Lawsuit to add Spectrum as a named defendant and requested that CIC participate in Spectrum's defense. [#37 at 8; #39-1, CSOF10] Although it is undisputed that neither Cheesman nor MiddleOak tendered a claim to CIC for the defense and indemnity of Cheesman at that time, MiddleOak argues that the tender of the amended complaint on behalf of Spectrum provided CIC with actual notice of the claim against Cheesman—its additional insured—and "the general rule is that tender of a defense by one insured under a policy will satisfy the requirement for other insureds as well."[12] [#37 at 9 (citing 14 COUCH ON INS. § 200:30 ("An insurer has a duty to defend an additional insured if any part of the underlying claim against the additional insured falls within the scope of the policy and the insurer has actual notice of the claim against the additional insured, whether or not that

---

[12] It is unclear that this "general rule" applies in Colorado. As CIC points out in its reply, in contradiction to this general rule, "[m]any courts . . . hold that even despite an insurer's knowledge of litigation against its insured, no duty to defend attaches unless and until the insurer receives an indication that its participation is desired." [#39 at 9 (quoting *CH Properties, Inc. v. First Am. Title Ins. Co.*, 43 F. Supp. 3d 83, 96 (D.P.R. 2014) (collecting cases) (emphasis omitted)). The Colorado appellate courts do not appear to have directly addressed this issue. Because the Court finds the adequacy of CIC's notice of the claims against Cheesman to be a distinct and separate issue from the application of the no-voluntary payments clause, the Court finds it unnecessary to predict how the Colorado Supreme Court would resolve this split in authority from other jurisdictions.

claim was specifically tendered by the additional insured." (emphasis omitted))]

MiddleOak further argues that, even if CIC "did not have sufficient notice to protect its

interests, there is no evidence that [CIC] was prejudiced in any way." [#37 at 10]

MiddleOak's focus on actual notice and prejudice is misplaced. In *Travelers*

*Property Casualty Company of America v. Stresscon Corporation* ("*Stresscon*"), the

Supreme Court of Colorado held that the notice-prejudice rule, which requires an insurer

to show prejudice in order to avoid its coverage obligations based on an insured's failure

to provide timely notice of the claim, did not apply to the application of the no-voluntary

payments clause at issue in that case.[13]  370 P.3d 140, 143, 146 (Colo. 2016).  The court

explained that, violations of timely notice provisions, "in the absence of any resulting

prejudice, [are] technicalities from which insurers [would] reap a windfall" if strictly

enforced, whereas the no-voluntary payments clause at issue in *Stresscon* "far from

amounting to a mere technicality imposed upon an insured in an adhesion contract, was

a fundamental term defining the limits or extent of coverage."  *Id.* at 143-44 (quotation

omitted).  CIC's enforcement of the no-voluntary payments clause thus does not require

a showing that CIC was prejudiced by Cheesman's failure to obtain CIC's consent prior

to undertaking the obligations at issue.

Nor does CIC's prior actual knowledge of the claims against Cheesman preclude

application of the no-voluntary payments clause where, as here, the insured undertook

the obligations prior to obtaining a coverage decision from the insurer and without the

insurer's knowledge or consent.  The *Stresscon* court emphasized the distinction between

---

[13] The wording of the no-voluntary payments clause contained in the insurance policy at issue in *Stresscon* is identical to the wording of the no-voluntary payments clause in the CIC Policy.  *Compare Stresscon*, 370 P.3d at 142 *with* #34-9 at 38.

timely notice provisions that impose a technical obligation on the insured and no-voluntary payment provisions that define the scope of the coverage being provided without imposing any obligation on the insured. *Id.* In order for that distinction—and the plain meaning of the no-voluntary payments clause at issue in this case—to have meaning, the insured may not voluntarily incur an expense or obligation without first seeking the insurer's consent.[14] Here, it is undisputed that Cheesman undertook the defense costs and indemnity obligation at issue without first seeking CIC's consent or even tendering the claim to CIC. MiddleOak offers no justification for Cheesman's decision to incur these obligations without at least seeking CIC's consent as required by the no-voluntary payments clause. In failing to obtain CIC's consent, Cheesman "depriv[ed] [CIC] of its choice to defend or settle [the Parkville Lawsuit] in the first instance"—one of its bargained-for rights under the CIC Policy—and thereby attempted to expand the scope of coverage. *See id.* at 144 ("Rather than a provision purporting to bar an insured from voluntarily making payments or incurring expense without the consent of the insurer, for

---

[14] Notably, in *Stresscon*, the Colorado Supreme Court remanded for a determination of the applicability of the no-voluntary payments provision even though the insurer in that case had been expressly notified of the claim by the insured and had not offered any payment to the allegedly injured party. *See Stresscon*, 370 P.3d at 141. These facts are inconsistent with MiddleOak's apparent argument here that Cheesman was entitled to engage in self-help by incurring defense costs and indemnity obligations without CIC's consent, because CIC had not affirmatively reached out to Cheesman to offer a defense and indemnification when it obtained actual knowledge of the claims against Cheesman. Moreover, the *Stresscon* court explained that, where an insurer improperly denies or delays in providing coverage, the interests of the insured are protected by the availability of a tort remedy and, where an insurer has declined an offer to settle a lawsuit within policy limits, the ability to "protect itself from exposure to liability beyond the limits of its insurance coverage by assigning to the third-party claimant any claim it may have against its insurer for breach of the insurer's duty of good faith and fair dealing." *Id.* at 144-45. The court emphasized, however, that these rights do not suggest an insured's right to "resort[ ] to self-help." *Id.* at 145.

the breach of which the insurer would be absolved of compliance with its obligations under the policy, the no-voluntary-payments provision makes clear that coverage under the policy does not extend to indemnification for such payments or expenses in the first place, and instead, the no-voluntary-payments clause merely specifies that as uncovered expenses they will not be borne by the insurer.").

MiddleOak attempts to distinguish *Stresscon* solely on the basis that the voluntary payments at issue in that case were made by the *insured*, whereas, here, the "payments [were] made by another *insurer* to settle a case." [#37 at 11 (emphasis in original)] MiddleOak contends that "the reasons underlying [the *Stresscon*] decision are inapplicable here" [*id.* at 11], but it offers no justification for this conclusion, and the Court is aware of none. The *Stresscon* decision is premised upon the court's finding that the no-voluntary payments clause constituted a substantive term of the insurance policy that "goes to the scope of the policy's coverage" and "has important practical implications for the risks that insurers undertake and the premiums that insureds pay." 370 P.3d at 144 (quotation omitted). Although MiddleOak's claims are equitable claims independent of Cheesman's contractual rights against CIC, "[a]bsent a showing that a contractual provision violates public policy, equity should not be employed to defeat a party's bargained-for contractual rights . . . particularly . . . when a[n] . . . insurer is being sued by another entity with which it has no contractual relationship, to which it owes no independent obligation imposed by law . . ., and whose actions it has no ability to control." *Preferred Prof'l Ins. Co. v. Doctors Co.*, 419 P.3d 1020, 1027 (Colo. App. 2018); *see also Farmington Cas. Co. v. United Educators Ins. Risk Retention Grp., Inc.*, 36 F. App'x 408, 414 (10th Cir. 2002) (finding that Colorado Courts have held that "the lack of contractual

relations between [insurers] does not prevent an excess insurer from seeking contribution according to policy provisions"). The Court thus declines MiddleOak's invitation to impose on CIC—through equitable claims—an obligation that exceeds "the scope of the [CIC Policy's] coverage," which informed the "the risks that [CIC] undert[ook] and the premiums that [Spectrum] pa[id]." *Stresscon*, 370 P.3d at 144.

Accordingly, because Cheesman incurred the defense and indemnification costs at issue without seeking approval from—or even affirmatively tendering a claim to—CIC, the no-voluntary payments clause bars MiddleOak's claims seeking contribution from CIC for those costs. *See Insua v. Scottsdale Ins. Co.*, 129 Cal. Rptr. 2d 138, 142-43 (Cal. Ct. App. 2002) (finding that "[o]nce the insured has requested and been denied a defense by the insurer, the insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent," but "if the insured makes no demand to defend, the no-voluntary provision lawfully precludes recovery of pre-tender costs"). The Court thus **GRANTS** CIC summary judgment on MiddleOak's claims to the extent they seek contribution from CIC for the costs of defense and indemnity MiddleOak provided to Cheesman in the Parkville Lawsuit

IV.    **CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that

(1)    CIC's Request for Oral Argument [#42] is **DENIED**;

(2)    CIC's Motion for Summary Judgment [#34] is **GRANTED** to the extent it seeks a finding that MiddleOak is not entitled to contribution from CIC for (a) the indemnity provided to Spectrum in the Parkville Lawsuit, (b) the defense costs paid by MiddleOak to defend Cheesman in the Parkville

Lawsuit, and (c) the indemnity provided to Cheesman in the Parkville Lawsuit; and **DENIED** to the extent it seeks a finding that MiddleOak is not entitled to contribution from CIC for the defense costs paid by MiddleOak to defend Spectrum in the Parkville Lawsuit;

(3)     MiddleOak's Motion for Summary Judgment [#35] is **GRANTED** to the extent it seeks a finding that MiddleOak is entitled to contribution from CIC for the defense costs paid by MiddleOak to defend Spectrum in the Parkville Lawsuit; and **DENIED** to the extent it seeks a finding that MiddleOak is entitled to contribution from CIC for (a) the indemnity provided to Spectrum in the Parkville Lawsuit, (b) the defense costs paid by MiddleOak to defend Cheesman in the Parkville Lawsuit, and (c) the indemnity provided to Cheesman in the Parkville Lawsuit;

(4)     The parties shall be prepared to discuss at the Status Conference on May 30, 2019 at 10:30 AM how best to proceed with the issues remaining in this litigation in light of this Order.


DATED:  May 28, 2019                    BY THE COURT:


                                        s/Scott T. Varholak
                                        United States Magistrate Judge